José Antonio Antonetti, Plaintiff and Appellee, *v.* Eugenio Fernández García, today his heirs, etc., Defendants and Appellants.

No. 9525. Argued June 2, 1947. Decided March 19, 1948.

R. Cuevas Zequeira, Lionel Fernández Méndez and M. Orraca Torres for appellants. Leopoldo Tormes García for appellee.

*Per Curiam:* This appeal was taken from a judgment declaring José Antonio Antonetti an acknowledged natural child of Dr. Eugenio Fernández-García, and from an order denying a motion for a new trial. The assignment of errors is virtually directed against the weighing of the evidence and the order denying a new trial.

The evidence is conflicting. That accorded credit by the lower court supports its finding that the plaintiff had been in the uninterrupted possession of the status of a natural child of the defendant father. The case is on the border line, to such an extent, that a contrary judgment by the lower court would have been affirmed by this Court, taking into

account that portion of Rule 52 of the Rules of Civil Procedure which reads thus:

" . . . Findings of fact based on oral testimony shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

■■ As to the motion for a new trial based on the alleged prejudice of the trial judge, after an examination of the various incidents referred to in said motion, we fail to find anything tending to show passion, prejudice, or partiality on the part of the trial judge. And as to the newly discovered evidence, it will suffice to repeat what was said in the order denying a new trial, to wit:

" . . . we are not convinced that the defendant heirs prior to the trial exercised reasonable diligence in discovering or finding the same, especially when we take into consideration that between the first and the second hearings held there elapsed six days, during which the defendants, knowing the evidence of the plaintiff and having in their turn at their disposal persons well versed in the search of registries of vital statistics, could have discovered the new evidence on which they now base their alleged right."

By reason of the foregoing the judgment appealed from should be affirmed.

Mr. Justice Marrero did not participate herein.

---

Mr. Chief Justice Travieso, dissenting.

In the complaint herein, filed against the Heirs of Dr. Eugenio Fernández García, the plaintiff José Antonio Antonetti alleges as a first cause of action that Francisca Antonetti and the above-named doctor, while they both were single and capable of contracting marriage without any dispensation, had sexual relations in Salinas, Puerto Rico, about the years 1917 and 1918 as the result of which the plaintiff was born on or about May 12, 1918. It is further alleged that Fernández García "always supported, cherished, and looked

after the education and teaching of the plaintiff whom he treated, publicly and privately, as his child, said plaintiff having been in the uninterrupted possession of the status of a natural child of said Don Eugenio Fernández García"; and that the defendants have refused to acknowledge the plaintiff as a natural child of their ancestor. As a second cause of action, it is alleged that the decedent left property valued in excess of $500,000; that the plaintiff is entitled to share in the estate as a natural child of the decedent Dr. Fernández García; and that the defendants have failed to deliver such share to him. The plaintiff prays that he be declared an acknowledged natural child of the decedent, entitled to bear the latter's surname, and that the defendants be adjudged to deliver to the plaintiff his share in the inheritance and to pay costs and attorney's fees.

The defendant heirs answered and specifically denied the essential averments of the complaint.

From a judgment rendered by the District Court of San Juan, in accordance with the prayer of the complaint, the defendants have taken the present appeal. The defendants have also appealed from an order dated April 7, 1947, denying a motion for a new trial requested by them.

We will consider first the appeal taken from the judgment inasmuch as if the same should prosper it would be unnecessary to pass upon the other appeal.

The defendants-appellants have assigned 8 errors claimed to have been committed by the trial court. We will examine first those which relate to the admission of the evidence.

1. The complaint does not contain any allegation regarding the existence of a concubinage between Dr. Fernández García and plaintiff's mother. The appellants urge that the lower court erred in admitting evidence as to a supposed concubinage. Let us make a summary of all the evidence adduced by the parties.

The first witness, Francisca Antonetti, mother of the plaintiff, testified as follows: She met Dr. Fernández García at the "playa" (seashore) of Salinas; he made love to her in her house on the occasion of his visiting her mother who was ill; about a month afterward the doctor took her to the town of Salinas to "Cayey Street, to some rooms belonging to Maximino Santiago" and there he kept a bed and all the necessary equipment for her. She became pregnant, and lived there 5 months. All this happened in the year 1917. About 2 months after going to live with the doctor she was pregnant. Afterward the doctor went to work to Fajardo, and she returned to the house of her parents at the "playa" of Salinas; and later, on May 12, 1918, the child was born. About 3 months after the child was born the doctor went there to see the child and to bring her some money; when the child was 7 months old, she went to Fajardo to see the doctor taking the child with her and the doctor took him in his arms and said: "It can not be denied." She did not see the doctor again until 1931, when she went to the Fernández García Clinic at Hato Rey. She had not seen the doctor during all that time (13 years) because she did not know his whereabouts and she went to see him in 1931 because she learned of his address through the newspapers. On that occasion the doctor gave her $50 and then and there stated to her referring to the child "that he was going to give the child an education and to help in his support." After that visit she saw the doctor 3 more times and went accompanied by Rafael Garay, a chauffeur, and her son. The doctor always received the boy very affectionately and gave him money. The boy was educated in Martiniano García College in Ponce and the doctor paid his expenses for tuition, clothing, etc., and sent money to the boy by mail. Before she had any relations with the doctor she was single, "a girl 17 years of age."

On cross-examination, she stated that she had another child by Ramón Vázquez, said child having been born 3 years after the birth of José Antonio; that the doctor helped José Antonio until the latter was 3 years old, for he sent money to her through her brother Tomás Antonetti; that 10 years went by without her hearing from the doctor; she lived with Vázquez as her husband and later with Donato Laboy; that she did not remember the name of the person who took her to Fajardo but she was certain that she went by automobile; that she went to live with the doctor in June 1917; that the doctor went to Fajardo at the time of the "Coconut and Bottle" Election; that the doctor started to help the plaintiff in 1931; that she went to Ponce to live in 1921; that the child was never registered in the Civil Register and was baptized in Ponce by Antonio Ortiz and Rufina Laboy.

Fidel A. Guillermety Ribas testified that he is auditor-accountant of the Fernández García Clinic; he sent letters and checks on behalf and by direction of the doctor to José Antonio Antonetti; the envelopes ordinarily contained checks and occasionally letters requesting the plaintiff to send the marks obtained in his studies, and that this was done pursuant to instructions from the doctor; that this started in 1939. The witness exhibited 60 checks sent by him to the plaintiff and dated from the year 1939 on.

Justo Santiago testified that he met the doctor in 1917; that Francisca Antonetti lived in a room in the house of Maximino Santiago on Cayey Street in Salinas, and lived there with the doctor; that the doctor was the only one who visited her and called on her almost every night; that the witness kept a girl in another room in the same house and also went to see her every night; that the doctor lived in town with his family in the home of his brother-in-law, Don Pepe Rovira, with his mother and sister; that Francisca became pregnant; that afterward she lived with Ramón Vázquez; and that the doctor went to Fajardo at the end of 1917.

Cornelio Alvarado testified that the doctor went to Fajardo after the "Coconut and Bottle" Election; that the doctor took Francisca to the house of Maximino Santiago on Cayey Street in Salinas; that they both lived there as husband and wife; that the doctor visited her there; that she became pregnant; that the doctor lived in Salinas in the home of his brother-in-law, Don Pepe Rovira, and stayed there regularly; that Francisca Antonetti gave birth to a child at the "playa" of Salinas; that all this happened in 1917.

On cross-examination, he stated that the doctor visited the house of Maximino Santiago where Francisca lived, but he could not say for what purpose he went there; that the doctor confided to him that he had a love affair with Francisca; that the child was born about the middle of the year 1918.

Teófilo Pérez testified that the doctor was the physician of the town of Salinas during the year 1917; that the doctor frequently called at the house of Francisca Antonetti at the "playa"; that Francisca went to the town to live on Cayey Street in the house of Maximino Santiago and the doctor also visited her there; that there "during the time she lived in that house he saw that her abdomen became increasingly bulgy"; that afterward Francisca gave birth to José Antonio at the "playa."

On cross-examination, he stated that Francisca was "made pregnant by the doctor" because he was the only one who visited her house; and that he supposed that the doctor visited her as her lover and not as a physician, because as a neighbor he witnessed the beginning of the affair when the doctor made love to her in the house of the girl's parents.

Rafael Garay testified that he is a driver of public automobiles; that in 1931 he brought Francisca and José Antonio in his automobile from Ponce to San Juan and left them in front of the Fernández García Clinic at Hato Rey; that afterward he brought them there on two more occasions but that he conveyed the plaintiff alone many more times; that

on one occasion the plaintiff told the doctor, "Dad, give me some money to pay the chauffeur"; that then the doctor took out a $5 bill and gave it to the witness for him to collect the charges.

José Antonio Antonetti testified that he met the doctor at the Fernández García Clinic in 1931, when the witness was accompanied by his mother; that afterward he saw the doctor frequently; that he received numerous checks sent to him by the doctor, "in order to pay for my tuition and also for my food and clothing"; that the relation of "parent and child" existed between him and the doctor; that he never was employed by the doctor nor rendered any services to him, and that he received the checks because he was his son; that the doctor treated him "as a father treats his child."

On cross-examination, he stated that he studied in Martínez Business College; that before he was 13 years old he did not have any relations whatsoever with the doctor; that the doctor helped him with money since 1931 and that it was in 1939 that he started to receive checks regularly—it was in this same year when he entered the commercial school; that the doctor treated him affectionately and they addressed each other intimately—however, from the letters which the plaintiff wrote to the doctor it appears that such was not the case, for in each letter the greeting was "Dear doctor" and the ending was "I remain, sincerely yours, José E. Antonetti"—; that he received aid from the doctor until 1943 when he went to work at Central Mercedita; that he did not seek to obtain due acknowledgment and the surname of his father prior to the death of Dr. Fernández García—he could not explain why he failed to enforce his right at that time—; that upon the death of the doctor, he had a conference with Dr. Fernández Cerra (a son of Fernández García) and Rafael Fernández García (a brother of Dr. Fernández García) but they failed to reach an agreement; that when he entered the Army he did not report the doctor as his

father; that the doctor discontinued his aid in 1943 because "I went into politics and also went to work for the central"; that he never demanded from the doctor any share in his property nor requested his acknowledgment; that he went to demand the share in the estate 17 days after the doctor died; that he did not attend the burial because he learned of the death too late.

Nicolás Benítez testified that he knew the doctor in Salinas and the plaintiff "almost since the latter was in his mother's womb"; that Francisca went to live with the doctor on Cayey Street during that year; that the doctor was the only one who visited Francisca at that time; that Francisca lived there until October 1917; that he saw the doctor in Ponce "about 10 or 11 years after the latter had gone to Fajardo, at the clinic of Dr. Pila" on the occasion of the inauguration of a new building there; that he went to greet the doctor and then the plaintiff came in and asked for the doctor's blessing and the following incident occurred:

"1 greeted him, and then the boy came and said, 'Your blessing, dad'; he put his arm over the boy's shoulder and said, 'Boy, how are you getting along with your studies?,' 'Very well, dad.'

"Q. What else, if anything, happened there?

"A. Then the boy said, 'Dad, are you going today? When are you going?' And he answered, 'Well, I am going to-night.' Then I went elsewhere and they remained behind."

On cross-examination, he stated that the doctor lived with his mother in Salinas in front of the square Las Delicias, but that during the nighttime "he visited the girl he had on Cayey Street"; that he saw the doctor come out of Francisca's room on Cayey Street sometime during the *last days of October 1917;* that the doctor went to Fajardo in November of 1917.

Such is the evidence introduced by the plaintiff. The first witness for the defendants was Rafael Modesto who stated that he had come to testify as a witness for the plaintiff

but that they did not call him; that he sent a telegram to Valentín Santiago care of Cruz Pacheco Ruiz, Sergeant-at-Arms of the Senate, on November 14, 1946 which read as follows: ''Suit against Heirs of Fernández set 20th instant. Strong proof being prepared here. If authorized come soon to work for compromise. Rafael Modesto.'' He explained that the reason why he sent the telegram was that he thought that everything could be settled without the need of going into court.

On cross-examination, he stated that the doctor knew Francisca when the latter was a girl and flirted with her on Cayey Street and on the seashore in 1917; that he is supervisor of rural schools at Salinas.

Valentín Jiménez testified that he is a brother of Valentín Santiago; that the telegram sent by Rafael Modesto was addressed to him; that in 1917 the doctor lived in Salinas in the home of Don Pepe Rovira; that while the doctor lived in Salinas the witness accompanied him on all his rounds as an assistant; that the doctor left for Fajardo sometime during the last weeks of June 1917; that after the doctor went to Fajardo he never returned to Salinas; that the witness went to Fajardo to work for the doctor on January 7, 1918; that he had never seen Francisca or José Antonetti before but only recently when he saw them in Ponce; that the doctor never had a child in Salinas nor lived in concubinage with any woman; that in 1920 the doctor sent him to Michigan to study and paid his expenses.

On cross-examination, he stated that he made some investigations in connection with this matter at the request of the heirs of Dr. Fernández García; that he is very grateful to the doctor and his family for many favors.

Eladio J. Candal testified that he is a certified public accountant; that he was assistant comptroller of Central Fajardo from 1913 to 1921; that the doctor was resident physician of the Fajardo Sugar Growers Association and started

to work in that capacity on July 1, 1917; that the doctor remained there until July 31, 1920.

On cross-examination, he stated that on August 13, 1946, he went to Fajardo to look up the records and he was thus able to verify that the doctor had started his work in Fajardo on July 1, 1917; he did this at the request of the heirs of Fernández García.

Fidel A. Guillermety Ribas testified that he is auditor of the Fernández García Clinic; that he has held this position since 1930; that he received instructions from the doctor to send a check to the plaintiff at the beginning of 1939; that he started to send the plaintiff $8 monthly; that this money was sent to him for his tuition; that this continued until the middle of 1943; that the maximum amount sent monthly was $15; that the doctor gave similar aid to other persons, to some 35 or 40 different persons; that in 1943 the doctor instructed him to discontinue the aid for the plaintiff because the latter was engaged in politics and because he had abandoned his studies.

Dr. J. L. Montalvo Guenard testified that he practiced his profession in Salinas from 1916 to 1920; that the doctor lived with his mother in the home of Don Pepe Rovira; that the doctor went to Fajardo in June 1917; that once he left for Fajardo he never returned to Salinas; that he did not know the plaintiff nor did he know of any woman kept by the doctor while the latter was in Salinas.

Leopoldo Morera testified that he resided in Salinas from 1916 until 12 years ago and that he never heard it said that the doctor had any affair with any woman in Salinas; that in 1917 the doctor lived with Don José Rovira. On cross-examination, he stated that he knew Francisca Antonetti since she was a child; that she had a good reputation; that he could not say what the doctor did in the nighttime while he lived in Salinas because the witness never left his house at night.

José María Rovira testified that he was a brother-in-law of the doctor; that in 1916 the doctor lived in his home in Salinas; that the doctor continued to live there until the end of June 1917 when he went to Fajardo; that the doctor did not reside in Salinas at the time of the "Coconut and Bottle" Election; that the doctor had no relations of any sort with Francisca Antonetti nor had any child by her.

Rafael Fernández García testified that he is a brother of the doctor; that the latter lived with his mother in Salinas in the home of José Rovira in 1916 and 1917; that the doctor went to Fajardo in June 1917 and never went back to Salinas; that the doctor resided in Fajardo at the time of the Coconut and Bottle Election; that while the doctor lived in Salinas he lived a clean and home-loving life; that he never knew that his brother had any relation with Francisca or with any other woman; that he met the plaintiff at the clinic when the latter went to claim a share in the estate; that the plaintiff told him that he was a son of his brother; that on that occasion the plaintiff showed him a letter signed by Guillermety (the auditor of the clinic) where he was asked about his studies; that the plaintiff asked him to settle the matter by employing him in the clinic; that his brother never mentioned to him that he had any child in Salinas. On cross-examination, he stated that the doctor was unmarried while he resided in Salinas.

Eugenio Fernández Cerra testified that he is a legitimate son of the doctor; that he had met the plaintiff about two weeks after the doctor died. The testimony of this witness makes reference to the occasion when the plaintiff went to the clinic to claim his alleged rights.

Carmelina Cerra de Fernández García testified that she is the widow of the doctor; that the doctor used to give financial aid to needy students including the plaintiff, and that the heirs had continued that practice; she mentioned several persons who received aid from the doctor.

The complaint is based on § 125 of the Civil Code, 1930 ed., which in its pertinent part provides:

"Section 125.—Natural children are those born out of wedlock, from parents who, at the moment when such children were conceived or were born, could have intermarried with or without dispensation.

" *       *       *       *       *       *       *

"The father is obliged to recognize the natural child.

"1. *  .       *       *       *       *       *       *

"2. Where the child has uninterruptedly enjoyed the condition as of a natural child of the defendant father justified by acts of the same father or of his family.

"3. When the mother was known to have lived in concubinage with the father, both during her pregnancy and at the time of the birth of the child."

The evidence introduced by the plaintiff tended to support the two essential allegations of the complaint, to wit: (*a*) that the plaintiff was conceived in the year 1917, when his alleged father and his natural mother were single and could have married; and (*b*) that the alleged father "always supported, cherished, and looked after the education and teaching of the plaintiff whom he treated, publicly and privately, as his child, said plaintiff having been in the uninterrupted possession of the status of a natural child of said Don Eugenio Fernández García."

The complaint does not contain any allegation that plaintiff's mother was known to have been living in concubinage with Dr. Fernández García during the period of gestation or at the time of the birth of the child. The evidence admitted over the objection of the defendants was not offered to prove the concubinage but to establish the sexual relations claimed to have existed between the alleged parents of the plaintiff. Moreover, if anything at all is shown by that evidence, it is that Francisca Antonetti did not live in concubinage with the alleged father of the plaintiff. The lower court did not err in admitting it.

2. The remaining assignments relate to the weighing of the evidence by the lower court. We will consider them jointly.

The evidence introduced by the plaintiff to establish the paternity of Dr. Fernández García is, in our judgment, insufficient. With the exception of Francisca Antonetti, who testified as to the alleged carnal relations between her and Dr. Fernández García, all that the witnesses for the plaintiff testified is that the doctor, who practiced his profession in the town of Salinas, visited the house of Maximino Santiago where Francisca Antonetti lived. As to what transpired inside the house, said witnesses neither saw nor know anything. Their statements, even if accorded credit, are not sufficient to justify the conclusion that the doctor's visits to the house of Santiago were not of a professional character but with the purpose of maintaining there sexual relations with Francisca Antonetti.

The testimony of Francisca Antonetti regarding the fact of paternity is indeed deficient and indefinite. She stated that the child was born on May 12, 1918. If this be true, the conception must have taken place on or about August 12, 1917. The uncontradicted evidence of the defendants shows that Dr. Fernández García transferred his domicile to the town of Fajardo and started to work there as resident physician of the Fajardo Sugar Growers Association on July 1, 1917. The positive statements of Mr. Candal and Dr. Montalvo Guenard regarding the fact of the removal of Dr. Fernández García to Fajardo at the end of June 1917, not having been contradicted, and the fact involved not being improbable or physically impossible, should have been accorded credit by the lower court. *Caballero* v. *González,* 53 P.R.R. 513; *Pedraza* v. *González, et al.,* 66 P.R.R. 713. It is incumbent on the plaintiff to show that he was conceived as a result of sexual relations between his natural mother and his alleged father. We fail to find any evidence which shows that Dr. Fernández García visited or had sexual relations with plain-

tiff's mother at any time during the months of July or August 1917, in one of which months must have been conceived the child born on May 12, 1918. It might be argued that it is possible that the doctor might have gone from Fajardo to Salinas to visit his lover, but that would be a mere conjecture lacking any probative force.

The lower court committed manifest error in holding that the alleged paternity had been established.

Assuming that said error was not committed, let us see whether the evidence introduced by the plaintiff is sufficient to support the allegation of the "uninterrupted possession of the status of a natural child" of Dr. Fernández García, justified by acts of the alleged father.

According to the testimony of Francisca Antonetti, when the boy was 7 months old she took him to Fajardo to see the doctor. The child attained the age of 7 months on December 12, 1918. Since the latter date until the year 1931 she did not see the doctor because she did not know his whereabouts. In 1931 she learned through the newspapers of the whereabouts of the doctor and then she saw him and the doctor gave her $50. It was 8 years afterward, in May 1939, when the plaintiff was 21 years of age, that the doctor started to send $15 monthly to the plaintiff to pay for his tuition in a commercial school in Ponce. Those payments terminated when the plaintiff abandoned his studies in order to go into politics.

The rule laid down by this Court in *Torres* v. *Heirs of Caballero*, 39 P.R.R. 654, 659, is applicable herein. In said case this Court, in affirming a judgment of dismissal, speaking through Mr. Justice Aldrey, said:

"For analyzing that evidence it is necessary to take into account some circumstances concurring in such cases. Of course, when it is sought to secure a declaration of the status of natural daughter of a father who had died the evidence should be studied and considered very carefully and even with certain suspicion, for the person

charged with certain acts of acknowledgment can not defend himself against them and as a rule his relatives, who very often are ignorant of the private life of the deceased, have to disprove the imputations against him without other than negative evidence generally. Besides, it is usually a matter for suspicion that notwithstanding the lapse of many years (sixteen in the present case) without attributing to the putative father acts of acknowledgment, yet his death was awaited in order to sue then the prospective heirs. At any rate, it must be remembered always that evidence of the acts of acknowledgment must be strong and convincing, as we have said on many occasions, and that it must not be of isolated acts, but of such a nature as to show the continuous possession of the status of natural child from the alleged father or his family. But this does not mean that they must be uninterrupted during the whole life of the plaintiff child.''

It should be stated that the evidence as to both the paternity and the possession of the status of a natural child, in the case of *Torres* v. *Heirs of Caballero,* according to the summary thereof contained in the opinion, was much stronger and more convincing than the evidence introduced in the present case. In *Colón* v. *Tristani,* 44 P.R.R. 162 and 45 P.R.R. 219, and *Alicea* v. *Antuñano,* 50 P.R.R. 880, cited by the plaintiff-appellee, the evidence regarding the concubinage and the acts of acknowledgment was so strong and convincing that it left no doubt as to the filiation sought therein.

The evidence regarding the alleged continuous possession of the status of a natural child in this case lacks the strength and the convincing force required for a compliance with the rule laid down in the above-quoted decision. Here, as in *Torres* v. *Heirs of Caballero, supra,* the plaintiff waited 28 years, from his birth until the death of his alleged father, in order to sue then the persons who are to be the recipients of the estate. What the evidence shows, if anything, is not acts of acknowledgment but an abandonment thereof. Plaintiff's mother herself testified that from 1918 to 1931 neither she nor the child saw the doctor or received anything from him. The remaining portion of the evidence refers to iso-

462

lated acts, without fixing the dates thereof. It is true that the documentary evidence introduced by the plaintiff shows that, for a number of years, Dr. Fernández-García aided the plaintiff with the sum of $15 monthly to pay for his tuition in a commercial school. Nevertheless, that fact, which the defendants admitted, is not sufficient in itself to serve as a basis for a filiation declaration in favor of the plaintiff, since the uncontradicted evidence adduced by the defendants showed that Dr. Fernández-García aided in a similar way quite a number of insolvent students. The letters which the plaintiff wrote to the doctor show that the former received such aid, not as a son, but as a protége, since in them plaintiff expressed his gratitude and offered to return the sums received when he should be in position to do so.

For the reasons stated the undersigned is of the opinion that the lower court committed manifest error in the weighing of the evidence; that the latter is insufficient to support the complaint; and that the judgment appealed from should have been reversed and another rendered instead dismissing the complaint, with costs against the plaintiff.